**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**UNION INSURANCE COMPANY,**

**Plaintiffs,**

**v.**

**NEW ENGLAND ICE CREAM CORPORATION,**

**Defendant.**

**Civil Action No. 21-cv-10740-DJC**

**MEMORANDUM AND ORDER**

**CASPER, J.** **November 4, 2022**

## I. Introduction

Plaintiff Union Insurance Company ("Union") has filed this lawsuit against Defendant New England Ice Cream Corporation ("NEICC") seeking declaratory judgment pursuant to 28 U.S.C. § 2201 that it owes no coverage obligations in connection with an underlying tort action ("Underlying Action") by Angel Parilla Rivera ("Rivera") to Union's insured, NEICC. D. 1. NEICC has filed a counterclaim seeking declaratory judgment against Union that the insurer owes it both a duty to defend and a duty to indemnify in connection with the Underlying Action. D. 10. Both parties have now moved for summary judgment. D. 29, 33. For the reasons stated below, the Court DENIES Union's motion for summary judgment, D. 29, and ALLOWS NEICC's motion for summary judgment, D. 33.

## II. Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material

fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial. Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009). "Conclusory allegations, improbable inferences, and unsupported speculation," however, are "insufficient to establish a genuine dispute of fact." Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 146 (1st Cir. 2013) (citation and internal quotation mark omitted). "When deciding cross-motions for summary judgment, the court must consider each motion separately, drawing inferences against each movant in turn." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

## III. Factual Background

Unless otherwise noted, the following facts are undisputed. These facts are drawn from the various statements of undisputed material facts, D. 31, 35, each party's response to the same, D. 39, 41, and the documents attached thereto.

**A. Underlying Facts**

NEICC's core business involves the distribution of frozen ice cream products as well as variety of other frozen food products. D. 33-4 at 44; D. 34 at 2–3; D. 35 ¶ 11; D. 41 ¶ 11. NEICC's sales spike during the warmer months, April to September ("Peak Season"). D. 33-4 at 44, 48; D. 35 ¶ 11; D. 41 ¶ 11. From 2016 to 2019, NEICC monthly sales at least doubled during the Peak Season. D. 33-4 at 48. In January 2019, NEICC's monthly sales amounted to $3,606,019. Id. In June 2019, NEICC's monthly sales amounted to $10,157,135. Id. NEICC's customer base includes approximately 6,500 year-round clients and 1,500 purely season clients. Id. at 44; D. 35 ¶ 12; D. 41 ¶ 12. NEICC's year-round clients also have an increased demand for their products during the Peak Season. D. 33-4 at 44; D. 35 ¶ 12; D. 41 ¶ 12.

NEICC contends that to meet this increased demand, it hires more warehouse pickers ("pickers") to handpick products during the Peak Season. D. 33-4 at 44, 48; D. 35 ¶ 14. NEICC further contends that it works with multiple staffing agencies to fill their need for approximately ten additional warehouse pickers during Peak Season. D. 33-4 at 44; D. 35 ¶ 15; D. 34 at 3–4. Jamey Lagor, ("Lagor") NEICC's Executive Vice President, stated that the "vast majority" of these additional warehouse workers are released at the end of Peak Season. D. 33-4 at 44; D. 35 ¶ 23. The picker position requires workers to spend several hours in a commercial freezer. D. 33-4 at 45; D. 35 ¶ 22; D. 41 ¶ 22. For this reason, Lagor states that NEICC has a high turnover in the picker position, which can result in openings for Peak Season pickers to be considered for permanent employment after the Peak Season. D. 33-4 at 45; D. 35 ¶ 23; D. 41 ¶ 23 (disputing this contention to the extent that NEICC is arguing that such pickers are temporary workers under the Policy).

On or about March 13, 2018, NEICC executed the Monroe Staffing Services General Agreement (the "Staffing Agreement"), which provided in relevant part:

> [Monroe] shall provide one or more Employees (or Assigned Employees) as requested by [NEICC] from time to time. Such Employees of [Monroe] shall provide services under [NEICC's] management and supervision at a facility or in an environment controlled by [NEICC].
>
> [Monroe] will [r]ecruit, screen, interview, hire, and assign its Employees ("Assigned Employees") to perform the type of work as required and described by [NEICC] and will, as the common law employer of Assigned Employees, be responsible for the following:
>
> A. Pay Assigned Employees' wages and provide them with the benefits that [Monroe] offers to them and required by Federal, State, or Local law;
>
> B. Pay, withhold, and transmit payroll taxes; social security, Medicare, unemployment and other withholding deductions and payments. Provide unemployment insurance and workers' compensation benefits; and process all unemployment and workers' compensation claims involving Assigned Employees[.]

D. 33-4 at 82–88. Monroe staffed Rivera as an NEICC warehouse picker in April 2019. Id. at 46; D. 35 ¶ 28; D. 41 ¶ 28 (disputing this to the extent that NEICC contends that Rivera was a temporary worker). Rivera alleged that on or about April 28, 2019, while he was working in the course and scope of employment for Monroe as a laborer at NEICC's warehouse, NEICC negligently breached its duties "by expos[ing] [him] to freezing temperatures in the refrigerated warehouse with inadequate protective clothing . . . for prolonged periods of time." D. 33-4 at 3. Rivera alleges that as a result of NEICC's negligence, he suffered severe personal injuries. Id. Thereafter, Rivera filed suit against NEICC in Bristol Superior Court in January 2021 (the "Underlying Action"). D. 33-4 at 2. On February 25, 2021, Union denied that it had a duty to defend NEICC in the Underlying Action, relying on its conclusion that Rivera's claim was excluded from coverage. D. 39 ¶ 18. On April 6, 2021, however, Union stated that it "will agree

to defend NEICC against the [Underlying Action], subject to a full reservation of rights," D. 32-8 at 1, including the right to pursue this declaratory relief. Id. at 1–2; D. 31 ¶ 19.

**B. The Policy**

Union issued a policy, CPA 5115109-15, ("the Policy"), to International Ice Cream Corporation for the policy period November 1, 2018 to November 1, 2019, which includes an endorsement adding NEICC as a "named insured." D. 33-4 at 6-9. Under certain conditions, the Policy covers "Bodily Injury and Property Damage Liability." Id. at 14. The parties do not dispute that Rivera's injury would be covered under the Policy but for any exclusion. D. 39 ¶¶ 5–7; D. 40 ¶¶ 4–10. The parties dispute centers on whether the Employer's Liability exclusion under the Policy precludes coverage of Rivera's claim:

> [t]his insurance does not apply to: . . . '[b]odily injury' to: (1) [a]n 'employee' of the insured arising out of and in the course of: (a) [e]mployment by the insured; or (b) [p]erforming duties related to the conduct of the insured's business . . . This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

D. 33-4 at 15. The Policy defines "employee" to include a "leased worker," but does not include a "temporary worker." D. 33-4 at 16. A "leased worker" is defined as "a person leased to [the insured] by a labor leasing firm under an agreement between [the insured] and the labor leasing firm, to perform duties related to the conduct of your business." Id. at 17. As expressly provided in the Policy, this definition of "leased worker" does not include a "temporary worker." Id. A "temporary worker" is defined as "a person who is furnished to [the insured] to substitute for a permanent 'employee' on leave or to meet seasonal or short-term workload conditions." Id. at 19. Union contends that Rivera was a "leased worker" and, therefore, falls under the Employer's Liability exclusion and so there is no coverage under the Policy for his claim. NEICC takes the contrary position that

Rivera was a "temporary worker" and there is no exclusion of coverage of his claim under the Policy.

## IV. Procedural History

Union instituted this action against NEICC on May 5, 2021 seeking declaratory judgment as to its coverage obligations under the Policy for Rivera's claim. D. 1. NEICC has filed a counterclaim seeking same. D. 10. Both parties now have moved for summary judgment. D. 29; D. 33. The Court heard the parties on the pending motions and took the matters under advisement. D. 42.

## V. Discussion

### A. Duty to Indemnify and Duty to Defend

"The duty to defend . . . is antecedent to, and independent of, the duty to indemnify." Boston Symphony Orchestra v. Commercial Union Ins. Co., 406 Mass. 7, 10 (1989). Under Massachusetts law, "an insurer's duty to defend against a third-party suit is broader than its duty to indemnify, taking account of the uncertainty as to what may be proved." Great Am. Ins. Co. v. Riso, Inc., 479 F.3d 158, 160 (1st Cir. 2007). That is so because the duty to defend is focused on what is alleged in the Underlying Action, as opposed to the "further obligation to indemnify the insured against judgments obtained against it within the [P]olicy coverage." Sterilite Corp. v. Continental Cas. Co., 17 Mass. App. Ct. 316, 318 n.4 (1983).

"In determining whether the duty to defend has been triggered, the complaint is to be construed broadly[.]" Great Am. Ins. Co., 479 F.3d at 160. "'[T]he question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms,

the insurer must undertake the defense.  Otherwise stated, the process is one of envisaging what kinds of losses may be proved as lying within the range allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy.'"  Id. (quoting Sterilite, 17 Mass. App. Ct. at 318).

"The first type of evidence this Court must consider is the insurance policy:  if the 'policy coverage and its purpose' expressly exclude the claims in question 'an insurer is relieved of its duty to defend and investigate.'"  Arch Specialty Ins. Co. v. Colony Ins. Co., No. 19-12570-WGY, 2022 WL 773891, at *10 (D. Mass. Mar. 14, 2022) (quoting Clarendon Nat'l Ins. Co. v. Philadelphia Indem. Ins. Co., 954 F.3d 397, 405 (1st Cir. 2002)). "Second, the claims made in the Underlying Complaint are instrumental in determining the duty to defend.  'In order for the duty [to defend] to arise, the underlying complaint need only show, through general allegations, a possibility that the liability claim falls within the insurance coverage.  There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage.'"  Id. (quoting Billings v. Commerce Ins. Co., 458 Mass. 194, 200–01 (2010)). "Third, the duty to defend is also determined by the 'facts known or readily knowable' by the insurer."  Id. at 11 (quoting Metropolitan Prop. & Cas. Ins. Co. v. Devlin, 95 F. Supp. 3d 278, 281 (D. Mass. 2015)).  "The relevant extrinsic facts for this inquiry are those that 'may aid in [an insurer's] interpretation of the allegations in the complaint.'"  Id. (quoting Ferreira v. Chrysler Grp. LLC, 468 Mass. 336, 342 (2014)).  "[E]ven where the allegations in the complaint state or roughly sketch a claim covered by an insured's policy, no duty to defend and investigate arises if there is undisputed, readily knowable, and publicly available information in court records that demonstrates that the insurer has no duty to defend and if there is an undisputed extrinsic fact that

takes the case outside the coverage and that will not be litigated at the trial of the [U]nderlying [A]ction.'" Id. (quoting Clarendon, 954 F.3d at 405).

**B. Burden Shifting Framework**

The Court applies a burden shifting framework to establish whether a duty to defend exists. See Boazova v. Safety Ins. Co., 462 Mass. 346, 351 (2012). "At the first stage, '[t]he insured initially bears the burden showing that the allegations in the underlying complaint fit within the covered risks in the policy.'" Arch Specialty Ins. Co., 2022 WL 773891, at *13 (quoting Essex Ins. Co. v. BloomSouth Flooring Corp., 562 F.3d 399, 404 (1st Cir. 2009)). "[S]econd, '[o]nce the insured has satisfied this burden it falls to the insurer to prove the applicability of one or more separate and distinct exclusionary provisions' to avoid the duty to defend." Id. (quoting Essex Ins. Co., 562 F.3d at 404). "Finally, where the insured seeks to establish coverage through an exception contained within an exclusion to coverage, the burden shifts back to the insured to prove coverage for the claimed loss." Boazova, 462 Mass. at 351 (citing Highlands Ins. Co. v. Aerovox, Inc., 424 Mass. 226, 230–31 (1997)).

NEICC has the initial burden of proving that the claimed loss falls within the coverage of the Policy. See Arch Specialty Ins. Co., 2022 WL 773891, at *13. Union concedes that NEICC has satisfied this burden. D. 30 at 9–10.

The burden then shifts to Union to "prove the applicability" of the Employer's Liability exclusion. See Arch Specialty Ins. Co., 2022 WL 773891, at *13. The Policy excludes coverage of "bodily injury" to an "employee." D. 33-4 at 15, 16. The Policy defines "employee" to include a "leased worker," but does not include a "temporary worker." Id. at 16. Monroe staffed Rivera as an NEICC warehouse picker in April 2019. D. 33-4 at 46; D. 35 ¶ 28. Since the Policy defines "leased worker" as "a person leased to you by a labor leasing firm," NEICC concedes that Monroe,

a labor leasing firm, furnished Rivera to NEICC to "perform duties related to the conduct of [the] business." D. 33-4 at 17; D. 35 ¶ 28.

The burden, therefore, shifts again back to NEICC to establish that the "temporary worker" exception to the Employer's Liability exclusion applies. Boazova, 462 Mass. at 351. This is the crux of the parties' dispute, but NEICC satisfies this burden.

Although Union disputes NEICC's legal position that Rivera was a temporary worker, there is no factual dispute about the manner, nature and timing of his hiring. To meet increased demand, NEICC hires more warehouse pickers to handpick products during the Peak Season. D. 33-4 at 44; D. 35 ¶¶ 13–15. NEICC works with multiple staffing agencies to fill their need for additional warehouse pickers during Peak Season. D. 33-4 at 46; D. 34 at 3–4; D. 35 ¶¶ 13–15. NEICC contacted Monroe to request temporary staffing for the 2019 Peak Season. D. 33-4 at 46; 68, 82–88; D. 35 ¶ 27. Rivera was staffed in response to NEICC's request for temporary staffing. D. 33-4 at 46. He was leased to NEICC by a labor leasing firm, Monroe, pursuant to the Staffing Agreement. D. 33-4 at 82–88; D. 39 ¶ 2; D. 41 ¶ 1. Monroe staffed Rivera at NEICC in April 2019, the beginning of the Peak Season. D. 33-4 at 46; 68; D. 35 ¶ 28. It is also undisputed that Rivera was hired as part of NEICC's annual practice of requesting temporary staff from labor leasing firms to meet seasonal demand and that the "vast majority" of these pickers are released at the end of the Peak Season. D. 33-4 at 44-45. NEICC's sales spike during Peak Season, Id. at 48; D. 35 ¶¶ 11–12, from 2016 to 2019, NEICC monthly sales at least doubled during this Peak Season, D. 33-4 at 48; D. 35 ¶ 18; D. 41 ¶ 18, and even its year-round clients have an increased demand for their products during the Peak Season. D. 33-4 at 44; D. 35 ¶ 12; D. 41 ¶ 12.

The key cases cited by both parties support NEICC's position that Rivera was a temporary worker. In Central Mut. Ins. Co. v. True Plastics, Inc., 84 Mass. App. Ct. 17 (2013), the court

faced the same dispute regarding the application of an Employer Liability exclusion that excluded coverage for leased workers but did not exclude coverage for temporary workers. Id. at 21. There, the owner of True Plastics would turn to staffing agencies to hire additional workers if his assessment was that his current workforce could not complete an order on its own. Id. at 20. The insurer disputed that the injured worker had been hired to "meet seasonal or short-term workload conditions" as required there (as it is here) for the definition of "temporary worker" under the exception to the exclusion. Id. at 23-25. Although the insurer contended that "short-term" workload could not be "indefinite," the court disagreed concluding that a "short-term workload condition need not necessarily be of finite duration" and the assessment of whether the hiring was for "short-term workload condition" must be "assessed prospectively, i.e., from the time the worker is furnished…only requir[ing] a factual inquiry into the reasonable expectation of the insured at the time the worker was furnished." Id. at 23-25 (concluding that the insured had met its burden of showing that the worker was a temporary worker and, therefore, there was no exclusion of coverage under the policy). In its analysis, the Central Mut. Ins. Co. court relied upon the analysis in Scottsdale Ins. Co. v. Torres, 561 F.3d 74 (1st Cir. 2009). The Scottsdale Ins. Co. court agreed with the district court's approach that whether a worker's hiring was to meet "short-term workload conditions" should be measured prospectively, i.e., looking at "the reasonable expectations of the parties concerning workload conditions, as measured at the time the employee is 'furnished.'" Id. at 79 (quoting district court). The First Circuit, however, "part[ed] company" with the district court's conclusion, reasoning that it "[did] not view [the worker's] 'indefinite' placement as necessarily incompatible with the possibility that he was addressing a 'short-term workload condition.'" Id. at 79 (reversing summary judgment for insurer and remanding).

On the record here, it cannot be disputed that the hiring of Rivera was for "seasonal . . . workload conditions" as required for showing that a worker is a temporary worker under the exception to the Employer Liability exclusion. Rivera was hired by Monroe for NEICC during its Peak Season to be a warehouse picker. In uncontroverted affidavits, Lagor and Claudia Guiterrez ("Guiterrez"), a Staffing Branch Manager for Monroe, attest to Rivera's role as a picker to meet NEICC's seasonal increased workload. D. 33-4 at 44–48; 68. Lagor attests that each season, he meets with the NEICC Warehouse Supervisor and the Director of Operations to evaluate sales volume, case volume and client lists to determine its needs for Peak Season staffing. Id. at 44. After the review, Lagor meets with staffing agencies to request Peak Season staffing. Id. Monroe furnished Rivera to NEICC in April 2019, in response to NEICC's request for staffing to work on Peak Season orders. Id. at 46. Rivera was assigned to work on the seasonal, increased workload as a picker. Id. Guiterrez also attests that "[a]t the time the employees are furnished to NEICC by Monroe, they are staffed to meet the heavier workload conditions during the busy ice cream season and are not staffed as direct hires" and that "Monroe furnished Rivera to NEICC to meet increased production needs" during this time. Id. at 68.

To contest that Rivera was a temporary worker, Union relies heavily on the response of Lagor to an inquiry from Jonathan Hurley ("Hurley"), Union senior claims representative. D. 31 ¶¶ 7–8; D. 32-4 at 1–2. Specifically, Hurley asked "[d]id you hire [Rivera] as a substitute for a permanent employee on leave or to meet seasonal or short-term need or was he hired through Monroe Staffing to perform duties related to the conduct of your business?" D. 31 ¶¶ 7; D. 32-4 at 2. In a May 15, 2020 e-mail, Lagor responded that:

> NEICC hired Mr. Rivera with the intention of a temp to permanent role. NEICC has been successful hiring temp to perm for our warehouse positions. The extreme cold warehouse environment is not for everybody, this allows NEICC to not invest upfront with employees that might leave the job after several weeks, days or hours.

> If the employee can do the job then after 90 days we move towards hire for full time employment with NEICC.

D. 31 ¶¶ 7; D. 32-4 at 1. Union also points to Rivera's understanding that the first 90 days at NEICC would be a "trial period," and that if he was a good employee, NEICC might hire him. D. 32-10 at 2. Looking prospectively at NEICC's intent in hiring Rivera, as the Court must under the relevant case law cited above, its intent was to address its seasonal needs. This is reflected in the timing of the hire, its workload needs at the time of hiring and its arrangement with Monroe to make this hire. That a temporary worker might become a permanent one, does not change the nature of that temporary engagement. Even Lagor's response to Hurley upon which Union relies, makes clear that the initial hire was as a temporary worker and any move to a permanent position might only come later if he could do the job and, even after 90 days, it would be a move toward hire, not a guaranteed hire which is supported by other uncontested evidence that most temporary workers hired in this manner are let go at the end of the Peak Season. D. 33-4 at 45, 109-10. Moreover, the availability of permanent, off-Peak Season positions varies given other factors, including the challenges of the (commercial freezer) environment. Id. at 45. That is, Lagor's sworn affidavit that "[a]t the time of his temporary hire, Rivera was furnished to meet the 2019 Peak Season workload conditions and not as a permanent employee," id., is neither contradicted by his email response to Hurley nor otherwise controverted as NEICC's prospective intent in hiring Rivera. Similarly, Rivera's deposition testimony that NEICC might hire him if he did a good job after 90 days does not change the nature of his initial hiring as a temporary worker where the analysis focuses upon the insured's prospective intent at the time of hiring.

Considering the totality of the record in light of the applicable law, the undisputed evidence is that Rivera was hired by Monroe to be a temporary worker for NEICC. Accordingly, NEICC has met its burden of showing that Rivera was a "temporary worker" under the exception to the

Employer's Liability exclusion under the Policy and, therefore, the Policy covers Rivera's claim against NEICC in the Underlying Action. Union, therefore, owes both a duty to defend and a duty to indemnify NEICC in connection with the Underlying Action.

## VI. Conclusion

For the foregoing reasons, the Court DENIES Union's motion for summary judgment, D. 29, and ALLOWS NEICC's cross-motion for summary judgment, D. 33.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge